[Cite as *In re J.S.*, 2025-Ohio-937.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: J.S.

C.A. No.     31175

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 23-04-0349

DECISION AND JOURNAL ENTRY

Dated: March 19, 2025

CARR, Presiding Judge.

{¶1}    Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed her child in the legal custody of his maternal aunt and uncle ("Aunt" and "Uncle").  This Court affirms.

I.

{¶2}    Mother is the biological mother of J.S., born January 26, 2023.  Although the child's paternity was established by genetic testing during the proceedings, Father participated only sporadically in the case below and has not appealed.

{¶3}    Mother tested positive for methamphetamine immediately prior to the child's birth. She and Father were living together at that time in a home without running water and subject to condemnation and foreclosure proceedings.  Based on Mother's admitted history of methamphetamine use, her ongoing untreated mental health and substance abuse issues, both parents' past and ongoing involvement with the criminal justice system, Mother's and Father's

housing instability, and their history of intimate partner violence, Summit County Children Services Board ("CSB" or "the agency") filed a complaint alleging that J.S. was a dependent child. Due to statutory time constraints, CSB dismissed and refiled its complaint. The agency had removed the infant from Mother's custody when he was two days old and placed him with Aunt and Uncle. J.S. remained with them throughout the pendency of the refiled case.

{¶4} After the adjudicatory and initial dispositional hearings, the juvenile court found that J.S. was a dependent child and placed him in the temporary custody of CSB. The trial court adopted the agency's case plan as an order. Mother was required to obtain appropriate housing and financial resources to provide for the child's basic needs, complete substance abuse and mental health assessments, follow all recommendations of her service providers, and submit to CSB's and her probation officer's requests for random drug screens. As two men were alleged to be the child's father at that time, the case plan required them to submit to genetic testing to establish paternity. After paternity was established, Father was required to demonstrate that he could provide for J.S.' basic needs.

{¶5} Evidence at the next two review hearings showed that Mother was not making progress with her case plan objectives. She had stopped participating in substance abuse and mental health services. She was not employed, and her housing situation remained unstable and transient. Mother received new criminal charges, including a drug-related charge. Although Aunt and Uncle allowed Mother liberal visitation, Mother was sporadic in exercising those opportunities. Besides establishing paternity, Father refused to meet with the caseworker and guardian ad litem and otherwise declined to acknowledge his obligations under the case plan.

{¶6} In advance of the sunset dispositional hearing, CSB moved for legal custody to Aunt and Uncle. Mother moved alternatively for legal custody or a first six-month extension of

the agency's temporary custody. After the evidentiary hearing, the magistrate found that neither parent had made significant case plan progress to warrant an extension of temporary custody, and that an award of legal custody to Aunt and Uncle was in the child's best interest. The magistrate granted CSB's motion for legal custody. Mother filed timely objections.

{¶7} The juvenile court issued a judgment overruling Mother's objections. After finding that Mother and Father had failed to make significant progress on their case plan objectives, the trial court denied Mother's motion for a first six-month extension of temporary custody. Finding that an award of legal custody of J.S. to Aunt and Uncle was in the child's best interest, the juvenile court granted CSB's dispositional motion. Mother timely appealed, raising two assignments of error for review. This Court consolidates the assignments of error to facilitate review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN AWARDING LEGAL CUSTODY OF [J.S.] TO MATERNAL AUNT AND UNCLE [ ].

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN DENYING A SIX-MONTH EXTENSION OF THE AGENCY'S TEMPORARY CUSTODY.

{¶8} Mother argues that the juvenile court erred by granting CSB's motion for legal custody to Aunt and Uncle in lieu of granting her motion for a first six-month extension of temporary custody. This Court disagrees.

{¶9} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 2016-Ohio-1330, ¶ 12 (9th Dist.). The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but

Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 2016-Ohio-7994, ¶ 18 (9th Dist.), quoting *In re N.P.*, 2004-Ohio-110, ¶ 23 (9th Dist.). In that regard, the juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 2008-Ohio-5003, ¶ 9 (9th Dist.), citing *In re T.A.*, 2006-Ohio-4468, ¶ 17 (9th Dist.).

{¶10} The best interest factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 2014-Ohio-2748, ¶ 16 (9th Dist.). In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 2017-Ohio-1, ¶ 17 (9th Dist.). While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶11} Our standard of review for such challenges is well settled:

> On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest.

(Internal citations and quotations omitted.) *In re M.F.*, 2016-Ohio-2685, ¶ 7 (9th Dist.).

{¶12} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder

of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶13} CSB removed J.S. from Mother's custody upon his release from the hospital at two days old and placed the infant with Aunt and Uncle, in the only home he has ever lived. The maternal grandmother ("Grandmother") and Aunt's and Uncle's young adult daughter ("Cousin") also live in the home.

{¶14} J.S. is closely bonded with Aunt, Uncle, Grandmother, and Cousin, all of whom play significant roles in the child's care. Grandmother provides daily care for the child while Aunt and Uncle work. Uncle's parents live nearby and also babysit and spend time with J.S. Aunt testified that Grandmother is a permanent resident in her home and will continue to have daily interaction with J.S. It is Grandmother who typically supervises the parents' full-day visits when they occur.

{¶15} Mother and Father initially visited the child under Grandmother's supervision at Aunt's and Uncle's house, but the parents did not consistently attend those visits. Mother blamed a fire at Father's home and the parents' intermittent break ups for the inconsistency. While the parents' interaction with J.S. during those visits was appropriate, Mother and Father got into an altercation with each other in Aunt's driveway on one occasion that necessitated police intervention. Aunt testified that she was concerned about J.S. witnessing his parents fighting.

{¶16} The parents' visits became more consistent once Grandmother started bringing the child to wherever Mother and Father were living at the time. Grandmother remained on site while the parents provided care for the child during weekly eight-hour visits. Although Mother struggled

with caregiver tasks early on, Aunt testified that Mother had learned how to appropriately feed and diaper the child. Aunt recognized that J.S. had developed a bond with Mother.

{¶17} After almost 15 months in custodial limbo, the child required permanence. Aunt and Uncle were willing and able to provide a safe and stable home for J.S. for the duration of his minority. They consistently met all the child's basic needs and prioritized the child's ongoing relationship with his family, including both Mother and Father. Aunt testified that she allows Mother to be "as active as she wants to be in [J.S.'] life[.]" The child is healthy, happy, and thriving in Aunt's and Uncle's home.

{¶18} Mother and Father, on the other hand, remained unable to provide the necessary safety and stability for J.S. Father consistently refused to meet with the caseworker and guardian ad litem. After the caseworker asked Father to submit to monthly drug screens, Father texted him, telling the caseworker to stop harassing him. Father never provided any verification of income or housing. The home he owned when J.S. was born was in foreclosure and then burned down, leaving Father to live in hotels. The caseworker testified that Father was no longer living in a hotel at the time of the hearing, although he did not know where Father had moved. Father made negligible progress on his basic needs case plan objective and demonstrated no desire to work with CSB in pursuit of reunification.

{¶19} The agency caseworker testified that Mother also made insignificant progress on her case plan objectives. As to basic needs, Mother remained unemployed and had no source of income. She admitted that she had not worked in several years and had no pending job interviews. She was transient throughout the case, living occasionally with Father; with R.C., a man initially named as the child's alleged father; and in various other locations. The caseworker testified that he learned on the day of hearing that Mother had recently moved in with R.C., although she had

not reported that move to him. Throughout the case, Mother refused to allow the caseworker to visit any home in which she was residing. Upon questioning by the guardian ad litem, Mother testified that she is currently unable to meet the child's basic needs.

{¶20} Mother also failed to make progress on her substance abuse case plan objective. Although she had completed inpatient treatment before CSB refiled its complaint, Mother was terminated from the intensive outpatient treatment program for failing to comply with its rules. Over the next year, Mother did not participate in substance abuse counseling, was not involved with a sobriety support group, did not have a sobriety mentor, had twice tested positive for amphetamines during the two to three months before the hearing, admitted using drugs with Father, lived on and off with Father who was not supportive of Mother's sobriety objective, and was charged with a drug-related offense. She was unsure as to her sobriety date but guessed it was sometime in November 2023, although she tested positive for drugs three times after that. Mother gained little insight during the case, failing to recognize that Father posed an ongoing risk to her sobriety.

{¶21} The caseworker testified that Mother made little progress in addressing her mental health objective, as well. Her diagnoses included panic disorder, attention deficit hyperactivity disorder, depression, anxiety, and post traumatic stress disorder. She was also subject to paranoid and delusional thoughts. Mother had been prescribed three medications to help manage her symptoms. Although she was a client at Portage Path Behavioral Health ("PPBH"), Mother refused to sign a release of information for the caseworker until a couple months before the hearing. At that point, PPBH reported that Mother had had a medication management appointment three months earlier, but no other services since that time. Mother had no scheduled counseling appointments on the books.

{¶22} Mother testified that she focused her efforts throughout the case on her mental health in lieu of other objectives. Although she claimed to have been engaged in mental health services the whole time, she admitted that it had been over six months since her last counseling session. She blamed her transitioning from one of PPBH's offices to another and her currently assigned counselor for canceling appointments. Mother admitted that she did not inform the CSB caseworker that PPBH was routinely canceling her appointments because she did not believe he could help. Although she was recently hospitalized for a mental health crisis, Mother had no plan for reengaging in services. She testified that PPBH had offered her the option to participate in its Crisis Intervention Program which would allow her to live onsite for six weeks and give her access to housing resources. Mother declined to take advantage of that opportunity because she preferred to see how her relationship with R.C. "pann[ed] out[.]"

{¶23} Mother remained on probation at the time of the hearing. She testified that her probation would end the following month. The caseworker, however, testified that Mother had been "[m]arginally" compliant with the terms of her probation and that her probation officer was reevaluating the decision to terminate probation based on Mother's failure to disclose new criminal charges. The caseworker testified that Mother was currently involved in an intervention in lieu of conviction program, although Mother was not sure whether she was involved. In any event, Mother was still involved with the criminal justice system.

{¶24} The guardian ad litem spoke on behalf of the 15-month-old child, opining that it was in his best interest to be placed in the legal custody of Aunt and Uncle. The guardian ad litem reported that J.S. "lights up" around Aunt and Uncle who provide a safe, stable, and loving home where all the child's needs are met. Mother agreed that J.S. was happy, healthy, and stable in Aunt's and Uncle's home. The guardian ad litem reported that Aunt and Uncle are committed to

allowing Mother and Father to be involved in the child's life. She was confident that Aunt and Uncle would continue to facilitate the parents' visitation while being in the best position to determine any ongoing need and level of supervision.

{¶25} The guardian ad litem opined that it would not be in the child's best interest to return him to Mother's legal custody or delay finalizing his permanent disposition by extending CSB's temporary custody. The guardian ad litem noted Father's lack of cooperation and interest in addressing case plan objectives. She testified that Mother had made very little progress on her case plan objectives, even after she and Mother met three months earlier to discuss what Mother would need to do to demonstrate that an extension of temporary custody was warranted. The guardian ad litem was concerned that Mother remained unemployed, had not rectified her housing instability, failed to participate in substance abuse and mental health services for much of the case, and continued to test positive for drug use despite her claims of sobriety. Given Mother's lack of motivation in working on her case plan objectives and her tendency to make excuses for her failure to make progress, the guardian ad litem opined that she did not believe that Mother would be able to demonstrate the ability to raise the child and offer him consistency within a six-month period of an extension of temporary custody.

{¶26} Based on a thorough review of the record, this is not the exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice by awarding legal custody to Aunt and Uncle. The child was comfortable and healthy in their home. They facilitated opportunities for Mother and Father to enjoy full-day visits with the child. J.S. enjoyed security and stability in the home of Aunt and Uncle who met all his basic needs. Grandmother was also a nurturing presence in the home. Mother, on the other hand, struggled with meeting her own basic needs, consistently relying on others like Father and R.C. for housing and other necessities. She

had not consistently begun to address her substance abuse and mental health issues. Father did nothing to demonstrate his ability to provide a home for the child. Under these circumstances, the juvenile court's finding that an award of legal custody to Aunt and Uncle was in the child's best interest is not against the manifest weight of the evidence.

{¶27} Mother also argues that the juvenile court erred by failing to grant her motion for a six-month extension of temporary custody. This Court disagrees.

{¶28} The juvenile court has authority to grant a first six-month extension of temporary custody only if it finds, by clear and convincing evidence, that the extension is in the best interest of the child, that "there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents . . . within the period of extension." R.C. 2151.415(D)(1). All three statutory requirements must be met to substantiate an extension of temporary custody, thereby delaying timely custodial permanence. *See In re A.P.*, 2022-Ohio-276, ¶ 9 (9th Dist.).

{¶29} As explained above, Mother failed to make significant progress on her case plan objectives. She had not addressed her mental health or substance abuse issues. She was admittedly not in a position to provide for the child's basic needs.

{¶30} Moreover, there was not reasonable cause to believe that J.S. would have been reunified with Mother within the period of extension. For 15 months, Mother was aware of the concerns underlying the child's removal from her custody immediately after his birth. Although she had access to multiple service providers who might have helped her address those concerns, she failed to take advantage of those opportunities. Even at the hearing, she expressed a desire to wait and see how her renewed relationship with R.C. progressed before pursuing resources to help her live independently. In addition, Mother never demonstrated sufficient progress to move

beyond the need for supervised visits. Accordingly, she failed to present clear and convincing evidence that reunification was reasonably likely to occur within another six months.

{¶31} For the above reasons, this Court concludes that the juvenile court did not err by denying Mother's motion for a six-month extension of temporary custody and granting CSB's motion for legal custody to Aunt and Uncle. Accordingly, Mother's first and second assignments of error are overruled.

## III.

{¶32} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, J.
SUTTON, J.
CONCUR.

APPEARANCES:

ANDREW KARAS, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

HOLLY FARAH, Guardian ad Litem.